Missouri, Kansas & Texas Railway Company of Texas
v. Sid Webb & Co.

Decided February 4, 1899.

**1. Negligence—Definition in Charge of Court.**

In an action against a railroad company for damages resulting from negligent delay in transporting a shipment of cattle, it was not error for the charge to define negligence as "the lack of that care which an ordinarily prudent person would exercise in the conduct of his own affairs under the circumstances of the given case."

**2. Carrier's Liability by Both Contract and Common Law—Pleading and Charge.**

Where, in a suit against a carrier for delay in transporting cattle, the pleading and proof tended to make a case both on a specific contract to transport within a certain time and on the common law duty of the carrier to transport within a reasonable time, the defendant was not prejudiced by the fact that the court submitted the case only upon the issue as to a reasonable time.

**3. Damages—Measure of—Market Value.**

The measure of damages for the depreciation in value of live stock shipped to a purchaser, by reason of the carrier's unreasonable delay in transportation and delivery, does not depend on the contract price, but is the difference in their market value at the time and place they ought to have been delivered and at the time of their actual delivery.

**4. Same—Special Damages—Notice.**

A carrier is not liable for special damages from delay of a shipment of live stock because of a special contract price at which the stock had been sold, unless it had notice thereof.

**5. Charge of Court—Request for.**

A requested charge not strictly accurate or applicable to the case as submitted, may be sufficient to call the court's attention to the necessity for a correct charge upon the given point or matter.

Appeal from Clay. Tried below before Hon. Geo. E. Miller.

*Eldridge & Gardner,* for appellant.

*Galloway & Templeton,* for appellees.

CONNER, Chief Justice.—This was a suit by appellees for the recovery of damages alleged to have been done them by reason of the negligence and delay in the shipment of certain cattle.

Appellees' amended petition, upon which the case went to trial, was in substance as follows:

"That defendant owns a line of railway from Wichita Falls, Texas, running through Jolly, Texas, to the city of Greenville, in Hunt County, Texas, where said line connects with the line of the Sherman, Shreveport & Southern Railway Company from Greenville to McKinney, in Collin County, Texas. That said railway companies were agents and partners of each other in the transportation of freight between Jolly and McKinney. That defendant also operated and controlled a line of railway from McKinney to East St. Louis, Ill., and was in the business of a common carrier from Jolly, via McKinney, to East St. Louis, Ill. That plaintiffs were on the 12th day of October, 1895, the owners of 2000 head of cattle, suitable to feed and fatten for market. That on the 13th day of September, 1895, plaintiffs, acting through Sid Webb, made a contract with the McKinney Cotton Oil Mill Company, as follows:

" 'Know all men by these presents, that the following contract made and entered into on this date by and between Sidney Webb, of Clay County, Texas, and Samuel Scaling, of the city of St. Louis, State of Missouri, composing the firm of Sidney Webb & Co., of Bellevue, Clay County, Texas, parties of the first part, and the McKinney Cotton Oil Mill Company, of McKinney, Collin County, Texas, parties of the second part, witnesseth:

" 'That the parties of the first part have this day sold to the said second party the following described cattle, to wit: The pick of one thousand head of steers out of the X & C V brands, supposed to be two thousand and seventy three head of steers, ages three years old and upward, said brands in no event to count out less than eighteen hundred head of steers, aged from three years old and upwards, said brand of cattle being now located in the pasture now held by the first party under a lease contract with Cox & Clark, of Fort Sill, Comanche Reservation, and located about nine miles south of Fort Sill. The party of the first part hereby bind themselves to deliver one thousand head of steers on board the cars at either Henrietta, Jolly, or Hazel Station, on the M. K. & T. R. R. Co., in Clay County, Texas, not later than the 10th day of October, 1895, and earlier than the 5th of October, 1895, unless said second party should ask for an earlier delivery. It is hereby expressly understood and agreed that said second party shall have the option of settling for the cattle at the time of final settlement at either the price of three cents per pound or thirty dollars per head. If said cattle are settled for at the price of three cents per pound, it is hereby understood that the said cattle are to be weighed at McKinney, Collin County, Texas, before feeding or watering. No expense to be attached to said first party after said cattle are loaded on the cars at either of the three sations heretofore named. The said second party has this day made an advance payment on said cattle of the sum of ten thousand dollars, for which said sum said first party has given their receipt to said second party.

" 'It is hereby further agreed and understood that said second party has an option of five days in which to decide whether or not they increase the number of cattle to fifteen hundred head, instead of one thousand head. In case they decide to buy the additional five hundred head, then it is agreed that they are to be the pick of five hundred head out of eight hundred and forty eight head of steers, aged three years old and upwards, said steers branded V and the other part 00, said cattle located in the same pasture as hereinbefore described. Second party has the option of paying for the additional five hundred head either by the pound or head at same price and on same conditions as mentioned heretofore. It is agreed and understood that·the first party is to hold and pasture free of cost to said second party as many as five hundred head out of the fifteen hundred head of steers until the 20th day of October, 1895, provided said second party desires them to do so, and on said 20th day of October, said first party agrees to deliver said 500 head of steers on board of cars at either Henrietta, Jolly, or Hazel, on the M. K. &. R. R., in Clay County, Texas. All erasures and interlineations made before signing.

" 'Witness our hands at Marlow, I. T., this 13th day of September, 1895.

" 'Sidney Webb & Co.,<br>" 'McKinney Cotton Oil Co.,<br>" 'By J. S. Heard, Pres.

" 'Signed in presence of F. M. Hill.'

"That on the 10th day of October, 1895, said McKinney Oil Mill Company, exercising its option under said contract, selected 1200 head of said cattle, and on the 12th day of October, 1895, agreed to take said cattle by weight at McKinney and to pay plaintiff for 1000 head thereof the sum of 3 cents per pound gross for said cattle before they were fed and watered, when weighed at McKinney, and to pay 2 8-10 cents per pound for said 200 head before being fed at McKinney. And that a like contract was made with F. M. Hill to pay 2 8-10 cents per pound for 200 head of said cattle, and 2 7-10 per pound for 100 head of same. That in and by each of said contracts it was agreed and understood that the title should not pass to the purchaser until they were delivered and weighed at McKinney, but that the purchasers were to pay the freight on said cattle from Jolly to McKinney. That said cattle were shipped in the name of said purchasers from Jolly to McKinney, to be fed at McKinney, and for the purpose of getting the benefit of the feed and transit rate from Jolly to McKinney and from McKinney to East St. Louis, Ill. That said facts were known to defendant, and that defendant knew of plaintiffs' interest in said cattle, and that he was the real owner thereof. That as an inducement to plaintiffs to permit said cattle to be shipped over defendant's said line of railway, defendant, through its agents, promised and agreed with plaintiffs and said purchasers to furnish suitable cars, engines, etc., and transport cattle speedily from Jolly

to McKinney and deliver same to the purchasers after they were correctly weighed, and agreed with plaintiff to complete said shipment within twelve hours from the time said cattle were received by defendant at Jolly. That the McKinney Cotton Oil Mill Company and F. M. Hill made said contract of shipment with defendant for plaintiffs as well as for themselves; that it was fully agreed between plaintiffs, said purchasers, and defendant, that plaintiffs should retain control of said cattle until weighed and delivered at McKinney. That plaintiffs, relying on said promises, were induced and did on the 12th day of October, 1895, at about 12 m., deliver said cattle to defendant for shipment, and that defendant's agents on said day received said cattle, loaded same on its cars, and began the transportation thereof, in four different trains. The first train left Jolly at 8 o'clock p. m., the second train left at 10 p. m., the third left at 12 p. m., and the fourth left at 11 o'clock, October 13th; that said cattle were shipped out in the names of the purchasers as the ostensible owners of same, but said shipment was in fact made for plaintiffs. That by reason of the premises defendant promised and agreed to safely, speedily, and expeditiously transport said cattle to said McKinney, and there deliver same within twelve hours from the time said cattle were received by. defendant at Jolly for shipment. That defendant did not safely and speedily transport said cattle within twelve hours from the time it received them, as it had agreed to do. That said cattle were greatly delayed in their journey. That defendant's stock pens at Jolly were insfficient to speedily handle and load said cattle on the cars; that they were poorly constructed and the cattle were badly crowded; that defendant's engines were not of sufficient weight and power to transport said cattle expeditiously; that they were not in good repair, and one broke down; that the cars were in poor condition, repeatedly broke down, and the train had to stop for them to be repaired; that they had hot boxes, and the engines were overloaded so that they could not make the time they should have made; that defendant negligently permitted its said line of railway to become overcrowded, so as to prevent said cattle being transported speedily; that if said cattle had been speedily transported they would have reached McKinney and been weighed and delivered in said twelve hours, viz., at about the hour of 4 o'clock on the morning of October 13, 1895; that by reason of said delays and negligence of defendant, the first train load of said cattle, consisting of 381 head, was delayed twelve hours longer than it should have been, and was not weighed and delivered at McKinney until about 4 o'clock p. m. October 13th; that the second train was needlessly delayed sixteen hours longer than it should have been, and was not weighed and delivered at McKinney until about 8 o'clock p. m. October 13th, which train contained 334 head of cattle; that the third train, containing 285 head, was likewise delayed twenty-four hours longer than they should have been, and were not delivered and weighed at McKinney until 7 o'clock October 14th; that the fourth train, containing 500 head of cattle, were not delivered and weighed at McKinney until 4 o'clock p. m. on October 14th, and

were delayed thirty-six hours longer than they should have been. That the first train weighed at McKinney on an average of 1034 pounds per head, the second train 994 pounds per head, the third train 975 pounds per head, and the fourth train 942 pounds per head. That said cattle were loaded without feed and water, and were greatly deteriorated in weight by reason of said delay. That if said cattle had been properly transported, with reasonable dispatch, said 1000 head sold by plaintiffs to said McKinney Oil Mill Company would have weighed at McKinney 1065 pounds per head, aggregating 1,065,000 pounds; that they in fact weighed 1000 pounds per head, aggregating 1,000,000 pounds; that by reason of defendant's negligence said cattle lost in weight 65,000 pounds, whereby plaintiffs were damaged $1954. That if said 400 head had been speedily transported they would have weighed 1050 pounds per head, aggregating 420,000; that as they were transported they weighed on an average 975 pounds per head, aggregating 390,000 pounds, by reason of which delay they lost in weight 30,000 pounds more than they would have done. That the remaining 100 head sold at 2 7-10 cents per pound would have weighed on an average of 1050 pounds per head; that as they were transported they only weighed on an average of 975 pounds per head, aggregating 97,500 pounds; that by reason of said delay they weighed 75,000 pounds less than they would have weighed. That by reason of the premises plaintiffs have been damaged by delay in transporting said last 500 head of cattle the sum of $1042.50. That plaintiffs have been damaged in all $3092.50. That said Sherman, Shreveport & Southern Railway Company were then and there carrying out said contract of shipment, and said two companies were acting together in said shipment of said cattle; that defendant had full knowledge of the purpose said cattle were being shipped, and that they were to be weighed and delivered to the purchasers at said city of McKinney, and that the real title to said cattle and ownership of same were in plaintiffs, and defendant was well aware of the necessity of the speedy transportation of same." "That appellant promised and agreed to furnish all necessary and suitable cars and engines wherewith to transport said cattle from Jolly to McKinney, and there to safely deliver the same to the purchasers and consignees thereof, after same had been correctly weighed. That notwithstanding the premises, and the duties and obligations imposed upon the defendant by the law and by its contract, it did not safely and speedily transport said cattle to said city of McKinney. That by reason of the negligence and carelessness of defendant, its agents, and servants, said cattle were greatly delayed in their journey, whereby they were greatly injured and damaged. The plaintiffs, by supplemental petition, pleaded under oath that the written contracts of shipment set up by defendant were without consideration to support same, and that they were not binding on plaintiffs."

Defendant answered by general exception, special exceptions, general denial, and not guilty, and specially that said cattle were shipped under three contracts, dated October 12, 1895, and two contracts dated October

13, 1895, made by the McKinney Oil Mill Company and F. M. Hill with defendant, in which defendant agreed to transport said cattle from Carlyle to Greenville, and there deliver same to its connecting line to McKinney, and that it was provided in each of said contracts that the duty and liability of defendant absolutely ceases and terminates upon delivering by it of said cattle to its connecting carrier, and denies under oath that it is a partner of the Sherman, Shreveport & Southern Railway Company, and denies agency existing between them.

The case was tried before a jury, and a verdict was returned in favor of plaintiffs for $650. Defendant filed a motion for new trial, which was overruled, and defendant perfected its appeal to this court.

The court below in its charge gave the following definition of negligence: "Negligence is the lack of that care which an ordinarily prudent person would exercise in the conduct of his own affairs, under the circumstances of the given case."

Mr. Rorer, in his work on Railroads, volume 2, pp. 1016, 1017, in speaking of negligence, says: "We have been unable to frame in our own mind, or by researches to find in the books, any one perfect or satisfactory definition of the term negligence, alike applicable, without more and without less, to all cases. The question of negligence is in its very nature so dependent upon the time, place, and circumstances surrounding each particular transaction, and so much influenced by the legal obligations and relative duties, of both commission and omission, that it comes before the jurist in aspects as varied as the ever-changing landscapes of the country, or the diversity of human affairs. No one is the type of all the rest, even if two or more of them be alike. * * * If very little care is due from him, and he fails to bestow that little, it is called gross negligence. If very great care is due, and he fails to come up to the mark required, it is called slight negligence. And if ordinary care is due, such as a prudent man would exercise in his own affairs, failure to bestow that amount of care is called ordinary negligence. In each case, the negligence, whatever epithet we give it, is failure to bestow the care and skill which the situation demands; and hence it is more strictly accurate perhaps to call it simply 'negligence.' And this seems to be the tendency of modern authorities."

Mr. Sackett, in his work on Instructions to Juries, defines ordinary care as follows: "Ordinary care depends upon the circumstances of each particular case, and is such care as a person of ordinary prudence and skill would usually exercise under the same or similar circumstances." Sackett's Instructions to Juries, 2d ed., sec. 14, p. 359.

Our Supreme Court, in the case of Railway v. Hodges, 76 Texas, 93, speaking by Judge Henry, says: "The standard to test the question of negligence vel non is the common experience of mankind, and implies generally the want of that care and diligence which ordinarily prudent men would use to prevent injury under the circumstances of the particular case. * * * What is ordinary care or diligence will vary with the surrounding circumstances and conditions."

This court, in the case of Railway v. Gorman, 6 Texas Civil Appeals, 230, refused to disturb the judgment because of error assigned to the following definition: "Negligence is the lack of that care which an ordinarily prudent man would exercise in the management of his own affairs."

We have examined many definitions of the term negligence, but will not incumber the record with further citation. It will be sufficient to say that, while we do not wish to be understood as expressly approving the particular definition given in the Gorman case or in this case as apt for all cases, yet we think that, under the facts of this case, no error to the prejudice of appellant was committed in giving the charge complained of; and we therefore overrule the first assignment.

In the sixteenth and seventeenth assignments appellant complains that the court, in the fifth and sixth clauses of its charge, erred in that therein the court submitted an issue not made by the pleadings and evidence, it being insisted that appellees' cause of action was predicated on an alleged special contract to transport cattle in twelve hours, and that they sued for special damages by reason of the same not being transported in said time.

The fifth section of the charge is as follows: "The defendant in this case was bound to transport the cattle in controversy over its own line and deliver to its connecting lines within a reasonable time, if the defendant and the Sherman, Shreveport & Southern Railway were not partners, as heretofore defined, and the last named road was not the agent of the defendant for the transportation of cattle from Greenville to McKinney, Texas. In case said railroads were partners, or the Sherman, Shreveport & Southern Railroad was agent of defendant for transportation of said cattle from Greenville to McKinney, Texas, then it was the duty of defendant to transport the cattle in controversy from Carlyle, Texas, to McKinney, Texas, within a reasonable time."

The sixth section of the charge is as follows: "If you find and believe from the evidence that the defendant undertook and agreed to transport the cattle in controversy from Carlyle, Texas, to Greenville, Texas, and delivered the same to its connecting line, and that defendant failed to transport said cattle from Carlyle, Texas, to Greenville, Texas, within a reasonable time, and that said failure constituted negligence, as hereinbefore defined, and that in consequence thereof the plaintiffs have sustained damage and suffered injury, then you will find for the plaintiffs and assess their damages at the difference between the value of the cattle in controversy, at McKinney, Texas, at the contract price proven, in the condition in which they arrived at the point of destination, and their value as above estimated in the condition in which they would have been had they been transported from Carlyle to Greenville, Texas, within a reasonable time, caused by the wrongful acts complained of; and if you further find and believe from the evidence that the railroads mentioned in this charge were partners, as hereinbefore defined, in the shipment of the cattle in controversy, or that the Sherman, Shreveport & Southern

Railway was the agent of the defendant for the transportation of the cattle in controversy from Greenville to McKinney, Texas, and that said railroad failed to transport said cattle from Greenville to McKinney, Texas, within a reasonable time, and that said failure constituted negligence, and that in consequence thereof the plaintiffs have sustained and suffered injury, then you may also find for the plaintiffs the damages sustained by them by reason of the delay, if any, of the Sherman, Shreveport & Southern Railway, to be estimated as indicated above."

We think it well settled in reason and by authority that the duty of the carrier to accept and carry the goods may arise either upon his common law obligation to that effect or upon some express contract made by him in that behalf. See Hutch. on Carr., 2d ed., sec. 768c.

It was certainly alleged in plaintiffs' petition that there was a special contract to transport plaintiffs' cattle from the point named to McKinney, Texas, within twelve hours, and there was evidence tending to support such allegation. For some reason the court below ignored this phase of the allegation and proof, and submitted the question on the legal obligation of appellant to convey said cattle within a reasonable time.

Under our system of pleading, the pleader may succinctly state all the facts constituting his cause of action or ground of defense. The facts so stated may constitute a cause of action arising ex contractu or ex delicto, or partly both. We think a careful analysis of plaintiffs' petition will show that, while plaintiffs averred a special contract to transport their cattle within twelve hours, they also averred negligence in the particulars set out and alleged a violation of appellant's duty to transport the same within a reasonable time. There was evidence supporting this phase of the case also, and if the court committed error in the particular complained of, it was but a limitation of plaintiffs' right, if any, to recover, and of which appellant has no cause of complaint. Appellant's sixteenth and seventeenth assignments are therefore overruled.

We think the eighteenth assignment, and the single proposition thereunder, sufficiently raise the following question: Did the court err in the sixth clause of its charge hereinbefore set out, in submitting the rule of damage by which the jury should be guided? This brings us, as we conceive it, to the serious question presented by this appeal.

It will be noted that the error, if error at all, is one of commission and not of omission, and therefore does not come within the rule that if the court's charge omits to charge a principle of law that should be given, such omission is not ground for error unless the party complaining has made the effort to correct the error by presenting a requested instruction supplying the deficiency.

As before stated, we think the plaintiffs' petition, in legal effect, presented two phases of the facts, and predicated a right of recovery upon the alleged negligence and failure of the transportation lines to comply with the legal duty to safely and speedily convey plaintiffs' cattle from Carlyle to Greenville and McKinney. The other was upon a special contract alleged to transport said cattle from Carlyle to McKinney in twelve

hours.  The court ignored the latter or special contract phase of the allegation and proof altogether, and submitted to the jury the issues arising under the former.  In effect, the court charged the jury that if they should find that the railway companies were negligent as alleged, and had failed to transport plaintiffs' cattle with reasonable safety and dispatch, and that plaintiffs were injured thereby, then plaintiffs' damages should be assessed at the difference between the value of the cattle in controversy at McKinney, Texas, at the *contract price proven,* in condition in which said cattle did arrive and in the condition in which they would have been had they been safely and speedily transported.

It was alleged and proven on the trial that plaintiffs' cattle were sold with the option on the part of the purchasers to pay therefor at the rate of $30 per head or at a certain number of cents per pound, the weight to be determined by weighing immediately after delivery of said cattle at McKinney and before they were fed or watered, and that said purchasers had exercised their option to pay for said cattle at the specified number of cents per pound, of all which it was alleged appellant had notice.

Mr. Sutherland, in his work on Damages, volume 3, sec. 932, says: "If goods are marked and known to the carrier to be destined beyond the terminus of his route and he becomes liable for a loss of them, or for damages for a negligent delay, there is some diversity as to whether the damages should be estimated with reference to the market value at the end of his route or at the ultimate destination.  On principle, the value at the latter place should be the criterion.  The value in one place and the depreciation in the other, according to the market at the ultimate destination, less the cost of transportation, is the actual loss to the owner; and it is as direct and proximate where there are several carriers as where the whole transportation is let to one.  The immediate carrier who is liable has undertaken the carriage of the goods with a knowledge of their intended destination; therefore the benefit to the shipper of their delivery at that place, and the disadvantage to him of a failure to so deliver them, are within the contemplation of both parties.  The damages recoverable from such carrier should be estimated on the basis of the net value at the place where he knows the owner of the goods intends them to go, for the same reason that in other cases damages are recoverable with reference to the value for any special use which was known to both parties at the time of making the contract.  In this view it is immaterial whether the through transportation is undertaken by one carrier, or the goods will be carried by several in a connected line, or by several not connected."

In another place the same author gives the general rule of damages as follows:  "In case of injury to or loss of property by the carrier's fault, he is required to make compensation on the basis of its market value at the place of destination.  In the former event the measure of damages is the difference between the value of the goods as, or in the condition when, delivered, and what their value would have been if they had not been damaged."  3 Suth. on Dam., sec. 918.

Hutchinson on Carriers, section 771, thus states the rule: "If the goods are intended for sale in the market at destination, and the carrier unreasonably and negligently delay their transportation, it is now universally agreed, whatever doubts may have been at one time entertained upon the subject, that the general rule by which the damages are to be computed, if goods of the particular kind have fallen in market value during the delay, or if they have depreciated in quality because of the delay, is the difference between the market value when the goods should have arrived and the value at the time of their delivery, the carrier being liable to the extent of the depreciation, with interest from the time when they should have been delivered."

Mr. Sedgwick, in his work on Damages, volume 2, section 854, says: "The extent of a carrier's liability for delay in the transportation or delivery of goods has been a subject of much discussion. * * * The measure of damages in the ordinary case is the difference in the value of the goods at the time and place they ought to have been delivered and at the time of their actual delivery, less unpaid freight, with interest." The context shows beyond question that by "difference in value," as above quoted, is meant the difference in market value.

In the case of Railway v. White & Best, 3 Willson, section 160, which was a suit for the recovery of damages for delay in the shipment of lumber, our former Court of Appeals held that "the true measure of damage in this case is the difference in the market value of the lumber at the time and place it should have been delivered and its market value at said place at the time it was delivered." To the same effect is the case of Railway v. Fagan, 72 Texas, 127, decided by our former Commission of Appeals and adopted by the Supreme Court. See also Railway v. Breeding, 16 S. W. Rep., 184.

We deem the citation of further authorities unnecessary. We think by the great weight of authority the general rule is as stated in the quotations we have given. This was not the rule given by the trial court. On the contrary, the jury were instructed to find the difference in value by reference to the contract price proven.

This general rule, in the absence of a special contract, and in the absence of notice to the transportation lines of special damages to accrue from unreasonable delay and of the special contract price agreed upon between appellee and the purchasers of his cattle, must be held to furnish the measure of appellees' damage, if any. In the absence of such notice, the transportation lines, if wrongdoers, were answerable for such injurious consequences of their negligence as, according to the usual course of events and the general experience, were likely to ensue, and which therefore they may reasonably be supposed to have foreseen and anticipated.

A delay of several hours, as shown in this case, no other injury being shown, may not have seriously affected the general market value of the cattle in controversy when delivered in McKinney; whereas the same delay, according to the general experience of mankind, would very con-

siderably reduce the amount actually received therefor when paid for by the pound, to be determined by immediate weighing, before feeding and watering.

It is not contended that a sale by weight was the usual and customary manner of making sales of cattle in McKinney at the time in question, and according to the usual course of events could not be reasonably supposed to have been in contemplation of the appellant at the time it received the cattle for shipment, in the absence of notice of appellees' contract to that effect.

It will be noticed that the court's charge nowhere made appellees' right to recover damages, as measured by his special contract, dependent on proof of notice thereof to appellant. Appellees alleged and offered evidence tending to show that appellant, through its general live stock agent, Jones, at the time of and before shipment, did have actual notice that the cattle shipped were to be paid for at the agreed price per pound, as ascertained by weighing at McKinney, Texas, before feeding and watering. This, however, was denied in the answer of appellant, and the proof on this issue conflicted sharply.

In this attitude of the allegations, proof, and the court's charge, appellant requested the following special instruction, which was refused by the court: "The court instructs you that this is a suit brought for special damages for shrinkage in the cattle described in plaintiffs' petition, by reason of their not being delivered at McKinney, Texas, within twelve hours, and if you find from the evidence that prior to or at the time of the shipment of said cattle from Jolly, Texas, to McKinney, Texas, that plaintiffs failed to notify defendant or its duly authorized agent that such damages would accrue if said cattle were not transported within twelve hours from Jolly to McKinney, and that defendant agreed to transport the same within twelve hours, you will find for the defendant."

The refusal of the court to give this instruction is also assigned as error.

As before stated, the court below ignored the case made, if any, arising from the alleged breach of the contract to transport the cattle within twelve hours, and hence probably considered it as inapplicable; but while perhaps not strictly accurate, or applicable to the case as submitted, yet we think it sufficient, under the circumstances of this case, to have called the court's attention to the fact that plaintiff sought to recover special damages or damages in the nature of profits under a special contract of sale, and to the fact of the omission in the charge of the court to require a finding by the jury that notice of such special contract or damage had been given by appellees.

Mr. Sutherland says: "In order to impose on the defaulting party a further liability than for damages arising naturally and directly, that is, in the ordinary course of things, from a breach of contract, such unusual or extraordinary damages must have been brought within the contemplation of the parties as the probable result of a breach at the time

of contracting. Generally, notice then given of any special circumstances which would show that the damages to be anticipated from a breach would be enhanced has been held sufficient for this effect." 3 Suth. on Dam., sec. 914.

Judge Watts, in the case of Express Company v. Darnell Bros., 62 Texas, 639, quotes with approval the following language: "Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i. e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it. Now, if the special circumstances under which the contract was actually made were communicated by the plaintiff to the defendants, and thus known to both parties, the damages resulting from the breach of such contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated. But, on the other hand, if these special circumstances were wholly unknown to the party breaking the contract, he, at the most, could only be supposed to have had in his contemplation the amount of injury which would generally arise, and in the great multitude of cases not affected by any special circumstances from such a breach of contract."

That was a case where suit was instituted to recover special damages for a delay of thirteen days in a shipment of certain mill machinery, and it was held that: "To authorize a recovery for the loss of profits, as damages, occasioned by suspension of their milling operations, it was essential for the appellees not only to prove that such suspension was caused or rather continued by the failure to promptly forward the cylinder, but also that such facts had been communicated to appellant as would have reasonably indicated the result which would or might have been expected to flow from a delay in forwarding the same. Such elements of damage would not necessarily result from such delay. Nor are they such as might be reasonably supposed to have entered into the contemplation of the respective parties, at the time the contract was made, as the probable result of its breach." 62 Texas, 641.

We think these rules fairly expressive of all the authorities, and when applied to the case before us they sufficiently indicate that there was error in the charge of the court for which the cause must be reversed and remanded; and it is so ordered.

*Reversed and remanded.*